UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| LINDA DRINNIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:11-CV-00243 (CEJ) |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On August 25, 2005, plaintiff Linda Drinnin filed an application for disability insurance benefits, Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, with an alleged onset date of February 24, 2005. (Tr. 12, 78-83). After plaintiff's application was denied on initial consideration (Tr. 47-53), she requested a hearing from an Administrative Law Judge (ALJ) (Tr. 12).

Plaintiff and counsel appeared for a hearing on June 24, 2008. (Tr. 23-42). The ALJ issued a decision denying plaintiff's claims on July 16, 2008 (Tr. 12-19), and the Appeals Council denied plaintiff's request for review on December 10, 2011. (Tr. 1-3). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability Application Documents

In her Disability Report (Tr. 107-15), plaintiff listed her disabling conditions as residual neck, right arm, and right hand pain from a neck fusion operation and carpal tunnel syndrome. She stated she was unable to work because the pain limited her

ability to sit, stand, or walk for more than short periods of time, kept her from lifting anything heavy, and impaired her concentration and memory. On "bad days," she was unable to do anything at all, while on "good days" she could do limited chores around the house. Plaintiff's medications included Cymbalta[1], Darvocet[2], and Naproxen[3] for pain. (Tr. 113).

In her Function Report (Tr. 116-23), plaintiff stated that after she wakes up in the morning, she takes her medicine, showers, and tries to help her children get ready for school. Then she does light chores around the house and sometimes runs short errands if she felt well enough. She then watches television until she has to get her children from the bus stop. In the evening, she helps her husband with dinner, helps her children with homework, and finally goes to bed. She stated that she does not help with the pets. She had trouble with buttons and shoe laces when dressing, and she had to use her left hand for most personal care. When she felt well enough, she was able to do light chores, including housecleaning, but someone had to carry the laundry for her. She wished she could do normal things by herself. She was able to leave the house by both walking and by driving, but she only drove by herself for short trips around 10-15 minutes long. She could handle money and pay bills but was unable to count pick up coins. She had difficulty with lifting, squatting, bending, standing,

---

[1]Cymbalta, or Duloxetine, is used to treat depression and generalized anxiety disorder and pain and tingling caused by diabetic neuropathy and fibromyalgia. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

[2]Darvocet is a centrally acting narcotic analgesic agent indicated for relief from mild to moderate pain. It can produce dependence. See Phys. Desk Ref. 3497 (60th ed. 2006).

[3]Naproxen is the generic name for Naprosyn, a nonsteroidal anti-inflammatory drug used for relief of the signs and symptoms of tendonitis and pain management. See Phys. Desk Ref. 2769-70 (60th ed. 2006).

walking, kneeling, and using her hands. She was afraid to do physical activities because she didn't want to aggravate or cause more injury to her neck. On December 13, 2006, plaintiff completed a Disability Report – Appeal (Tr. 132-136), in which she stated her daily activities and limitations remained largely unchanged from her earlier report.

## B. Hearing Testimony

At the time of the hearing, plaintiff was 43 years old. She lived with her husband and her two children, ages 14 and 6. Her youngest had been in full-time school for two years at this time. Plaintiff left school after completing one year of college. (Tr. 25-28).

Plaintiff last worked as a supervisor bank teller, a position she had held since 1990. She supervised eight people and performed general teller duties. She had previously worked for five years as a bank teller.

Plaintiff testified that her medical difficulties began after she broke her neck while painting her son's room. She testified that she had degenerative spinal syndrome. (Tr. 27). She underwent neck surgery in February 2005 and right carpal tunnel release in June 2006. At the time of the hearing, plaintiff stated that she had pain which traveled from her neck, down her right arm and into her right hand. She also had tingling and pain in her left hand that was milder than the pain in her right. Plaintiff was taking medication for high blood pressure, which fluctuated between high and low, and occasionally caused dizziness. (Tr. 29). One of plaintiff's doctors noted an existence of some depressive symptoms and anxiety, but she was not referred anywhere for treatment and did not receive a psychological evaluation. (Tr. 28-29). Plaintiff was given a bone stimulator to help bone growth, and she used for almost two years. (Tr. 30). Plaintiff testified she had begun to receive steroid shots for pain, which

-3-

helped "a little bit." (Tr. 36). She was also on Neurontin[4], which along with her other medications, caused drowsiness. (Tr. 37). She said she believed the right carpal tunnel release made the pain and tingling in her right hand worse, and as a result surgery on the left was not recommended. (Tr. 38).

Plaintiff testified that her problems with buttons and shoelaces had improved since the surgery. Grasping coins was still a problem, and anything that stimulated the nerves in her hands would make the pain worse. In addition, sitting, standing, lifting, and walking made the pain in her neck worse. She stated the heaviest item she could lift with her right arm was a cup of coffee, and the heaviest for her left arm was a gallon of milk. She could only sit or stand in one position for roughly 10-15 minutes, and she could only walk one block before the pain in her neck would become a problem. She had to lie down for four hours a day and could only do chores three days a week. When she was able to do chores, she would help with the laundry, load the dishwasher, and prepare meals. Her husband did most of the household work, including cleaning, washing dishes and laundry, and taking care of the children. Plaintiff testified she went to her children's school to read stories to the students for half an hour on Fridays. (Tr. 31-36).

## C. Medical Evidence

Plaintiff's application indicates a disability onset date of February 24, 2005. (Tr. 78). Plaintiff was treated by Jeffrey Draves, M.D., for dysthymia on April 20, 2004, and

---

[4]Neurontin is used to treat certain types of seizures in people with epilepsy and to relieve the pain of postherpetic neuralgia, the pain or aches that may occur after an attack of shingles. It is also prescribed for the treatment of restless leg syndrome, neuropathy, and hot flashes. It may be prescribed for other uses as well. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000940/ (last visited on July 25, 2011).

-4-

for depression related to stress and her mother's terminal illness on September 10, 2004. She continued to take Paxil[5] daily and reported to be doing better. Dr. Draves reported that plaintiff had good insight and understanding, and that she was well-dressed and well-groomed. (Tr. 150).

On February, 25, 2005, plaintiff was admitted to St. Anthony's Medical Center after falling while painting her son's room. (Tr. 163-64, 267). On February 26, 2005, Charles A. Wetherington, M.D., performed a cervical discectomy and fusion and plating at the C4-C6 vertebrae (Tr. 158, 169-71). Plaintiff was stable after the surgery, but reported some residual numbness and paresthesia in her fingers. (Tr. 166). Plaintiff was evaluated by consulting physician Min Pan, M.D., for bilateral upper extremity numbness, tingling, pain, and weakness. Dr. Pan noted weakness in plaintiff's hands following the neck surgery. (Tr. 145). Upon discharge, plaintiff was diagnosed with degenerative joint disease with spinal stenosis[6] and radiculopathy[7], a history of depression, and tobacco abuse disorder. (Tr. 158, 166). She was prescribed Neurontin, nortriptyline[8], chlorzoxaone, and a nicotine patch. (Tr. 166).

Plaintiff saw Dr. Draves on March 4, 2005, following her surgery. He noted that plaintiff seemed to be doing well, that she had no other complaints at that time, and

---

[5]Paxil is a psychotropic drug indicated for the treatment of major depressive disorder, obsessive-compulsive disorder, panic disorder, social anxiety disorder, generalized anxiety disorder, and post-traumatic stress disorder. See Phys. Desk. Ref. 1501-03 (60th ed. 2006).

[6]A stricture of any canal. Stedman's Med. Dict. 1673 (26th ed. 1995).

[7]Disorder of the spinal nerve roots; synonymous with radiculitis. See Stedman's Med. Dict. 1503 (27th ed. 2000).

[8]Nortriptyline is a tricyclic antidepressant. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682620.html (last visited on May 25, 2010).

that she was interested in quitting smoking. Plaintiff had begun to decrease her use of Paxil, and Dr. Draves prescribed Wellbutrin[9] to help plaintiff stop smoking. (Tr. 149).

On March 8th, plaintiff received a post-surgical neurological evaluation from Gary Myers, M.D. Plaintiff reported pain in the 3rd and 4th digits of her right hand, radiating pain through her neck, and pain from her left elbow into her left hand. Dr. Myers attributed this to root irritation at C7. He noted in his examination significant pain and tenderness with gentle palpation in the 3rd and 4th digits of both hands. He also reported improvement in plaintiff's condition and his optimism in a good recovery, though he noted that her symptoms might persist for three or more months. Dr. Myers increased plaintiff's nortriptyline at bedtime. (Tr. 144).

On the same date, plaintiff followed up with Dr. Wetherington. He noted plaintiff had good strength in her upper extremities and mild weakness in her hands, and she seemed to be doing better. Dr. Wetherington increased plaintiff's Neurontin to offset use of Darvocet. (Tr. 189). Plaintiff saw Dr. Wetherington again on April 12, 2005. He noted that plaintiff's condition had continued to improve and her pain was confined to her middle fingers. She continued to have good strength in her upper extremities. Review of her x-rays showed acceptable progress. Her medications were Darvocet, Parafon, Neurontin, nortriptyline, and Wellbrutrin. Dr. Wetherington instructed plaintiff to begin slowly weaning herself from Neurontin and indicated that she should have physical therapy to help with pain. (Tr. 188).

---

[9]Wellbutrin, or Buproprion, is an antidepressant of the aminoketone class and is indicated for treatment of major depressive disorder. See Phys. Desk Ref. 1648-49 (63rd ed. 2009). It may be prescribed under the brand name Zyban to help people stop smoking. See http://www.nlm.nih.gov/medlineplus/druginfo/meds/ a695033.html (last visited Sept. 22, 2010).

From approximately April 18, 2005, through May 18, 2005, plaintiff attended physical therapy. (Tr. 217). At the beginning of therapy, records indicate increased pain with extension of the middle fingers. (Tr. 218). On May 24, 2005, after 12 sessions, plaintiff showed improvements in pain and range of motion but still reported numbness and tingling as well as sensitivity to ice and vibration. (Tr. 223).

On May 12, 2005, plaintiff returned to Dr. Draves, who diagnosed anxiety, persistent paresthesias, and status post cervical discectomy. Plaintiff reported that her mood was better. Her medications at the time were Wellbutrin, nortriptyline, Neurontin, and Paxil. (Tr. 149). On June 7, 2005, Dr. Myers noted marked improvement, although plaintiff still exhibited significant problems with her hands. She continued to have pain and tingling in her third fingers, radiating up her hands, as well as discomfort in her wrists. Dr. Myers noted plaintiff had symptoms consistent with carpal tunnel syndrome and recommended an EMG/nerve conduction study. (Tr. 143).

Plaintiff returned to Dr. Wetherington on June 21, 2005. She still reported pain in her middle fingers and neck discomfort, but also that she had continued to improve and medication further alleviated her symptoms. Plaintiff no longer took Parafon but still used 4 to 6 Darvocet pills a day. (Tr. 187). On September 20, 2005, plaintiff followed up with Dr. Wetherington who noted continued hand complaints as well as positive signs for Tinel's[10] and Phalen's[11]. X-rays showed good healing of the cervical spine, and plaintiff reported improvement in her neck pain. Dr. Wetherington

---

[10]Tinel's sign refers to distal tingling that occurs in response to tapping or palpation and may be a sign of nerve compression. See The Merck Manual of Diagnosis and Therapy 334,335, 339 (18th ed. 2006).

[11]A reproduction of tingling with wrist flexion, suggestive of carpal tunnel syndrome. The Merck Manual of Diagnosis and Therapy 334-35 (18th ed. 2006).

recommended a nerve conduction study, which was performed by Dr. Myers on September 26, 2005. (Tr. 185-86, 139). Dr. Myers showed findings consistent with bilateral mild carpal tunnel syndrome and a right C-7 nerve root lesion. (Tr. 140). Dr. Wetherington saw plaintiff again on October 4, 2005, and noted the finding of carpal tunnel syndrome in the conduction study. He recommended bilateral hand braces. (Tr. 185).

On December 6, 2005, Dr. Wetherington noted neck discomfort. Plaintiff reported improvement in her hands due to Cymbalta, but she had difficulty turning pages of a book and a separating sheets of paper. (Tr. 184). On December 29, 2005, Dr. Wetherington reviewed a CT scan of plaintiff's cervical spine and noted findings consistent with pseudoarthrosis, which he felt was related to her generalized neck pain. Dr. Wetherington recommended an exterior bone stimulator as treatment. (Tr. 183). Plaintiff returned four months later on April 18, 2006, and Dr. Wetherington noted improvement with bony fusion from the stimulator. Plaintiff reported some neck pain, but her chief complaint was discomfort in her hands. Dr. Wetherington recommended a right endoscopic carpal tunnel release to alleviate pain aggravation from plaintiff's carpal tunnel syndrome. (Tr. 182).

On July 5, 2006, Dr. Wetherington performed a right endoscopic carpal tunnel release. (Tr. 155-56). Plaintiff followed up a week later on July 11, 2006, but reported no significant change in her hand. (Tr. 181). Plaintiff followed up once again on September 21, 2006. She denied improvement in her hand, and Dr. Wetherington recommended a steroid injection. He prescribed Naproxen and noted that plaintiff's current medications included Darvocet and Cymbalta. (Tr. 180). Also in September 2006, plaintiff attended physical therapy for her hand on two occasions. (Tr. 199-203,

228-31). She continued to report tightness and sensitivity in her hand but records indicate she left with an improvement in pain and range of motion. (Tr. 228, 197).

Plaintiff saw Chad Shelton, M.D., for a trigger point steroid injection to her right hand on October 2, 2006. Plaintiff reported some improvement in her hand after the carpal tunnel release, but she still had tenderness and constant, moderate pain. Dr. Shelton prescribed Lidoderm patches for plaintiff's hand with the possibility of another injection. (Tr. 191-95, 254-65).

On November 30, 2006, a non-examining consultant identified in the record as H. Weems, completed a Psychiatric Review Technique form. (Tr. 236-46). Weems noted that plaintiff was diagnosed with dysthymia but opined that plaintiff's disorder was not severe, and that plaintiff had only a mild limitation due to difficulty maintaining concentration, persistence, or pace. Plaintiff reported the ability to engage in household chores and personal self care. Plaintiff also denied any problems in her ability to get along with others, follow directions, or pay attention. Weems opined that the evidence failed to support the existence of a severe mental impairment.

On the same date, consultant Melissa Guilliams prepared a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 247-52). She noted that plaintiff could lift or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and push or pull with no limits. The assessment indicated no ability to climb ladders, ropes, or scaffolds, and limitation with handling, fingering, and feeling. It was noted plaintiff should also refrain from concentrated exposure to extreme hot or cold, vibration, and hazards.

Plaintiff followed up with Dr. Shelton on May 9, 2007, complaining of constant, moderate pain in her neck and in her right arm and hand. She reported some relief from taking Baclofen[12], Cymbalta, Naproxen, and Darvocet. Plaintiff still had sensitivity to cold and pain with light touch in her hand. From a surgical standpoint, plaintiff was found to be doing well with respect to her neck. Dr. Shelton added Lyrica[13] to plaintiff's medications. (Tr. 266-67).

On September 25, 2007, plaintiff began care with Solomon Noguera, M.D., for general concerns including an abnormal liver test. (Tr. 277-79). In October 2007, Dr. Noguera saw plaintiff twice and noted hypertension, hyperlipidemia, dysmetabolic syndrome, and chronic fatigue. Plaintiff was then taking Naproxen, Darvocet, and Baclofen for pain and Lisinopril for hypertension. (Tr. 281-91). On November 27, 2007, plaintiff returned to Dr. Noguera for complaints of stress and depression. He noted plaintiff was anxious, depressed, sad, tearful, and agitated, but that she was able to make sensible decisions, was appropriate in social situations, and had appropriate thought processes. Exercise and stress reduction provided some alleviation. Dr. Noguera prescribed Prozac[14]. (Tr. 295-99). Plaintiff saw Dr. Noguera on January 27, 2008, with complaints of depression, anxiety, and back pain. Dr. Noguera referred plaintiff to a pain management physician. (Tr. 300-4). On April 21, 2008, plaintiff

---

[12]Baclofen decreases the number and severity of muscle spasms. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682530.html (last visited on Sept. 1, 2011).

[13]Lyrica, or Pregabalin, is an anticonvulsant indicated for the treatment of neuropathic pain and postherpetic neuralgia and for the management of fibromyalgia. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605045.html (last visited on Mar. 9, 2011).

[14]Prozac, or fluoxetine, is a psychotropic drug indicated for treatment of, *inter alia*, major depressive disorder. See Phys. Desk. Ref. 1772-72 (60th ed. 2006).

presented with the same mental and physical issues. Dr. Noguera refilled her prescriptions. (Tr. 306-10).

Plaintiff underwent pain management treatment with Nehal Modh, M.D., from April 2008 through June 2008. She complained of neck and upper extremity issues. Dr. Modh prescribed various pain medications and increased the dosage of Cymbalta. Plaintiff reported minimal improvement from medications. (Tr. 311-13).

### III.  The ALJ's Decision

In the decision issued on July 16, 2008, the ALJ made the following findings:

1.      Plaintiff meets the insured status requirements of the Social Security Act through March 31, 2011.

2.      Plaintiff has not engaged in substantial gainful activity since February 24, 2005, the alleged onset date.

3.      Plaintiff has the following severe impairments: residuals of cervical fusion and right carpal tunnel release[15].

4.      Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.      Plaintiff has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except she can never climb ladders, ropes or scaffolds, can only occasionally climb stairs or ramps, can engage in no repetitive overhead lifting or work involving very fine manipulation, and must avoid concentrated exposure to extremely cold temperatures, vibrations of the body, and working in hazardous situations such as at heights.

6.      Plaintiff is unable to perform any past relevant work (20 C.F.R. 404.1565).

7.      Plaintiff was born on June 3, 1965, and was 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. 404.1563).

---

[15]The ALJ mistakenly referred to "carpal tunnel release" when he likely meant "carpal tunnel syndrome."

8. Plaintiff has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the plaintiff is "not disabled," whether or not the plaintiff has transferable job skills (See S.S.R. 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering the plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the plaintiff can perform (20 C.F.R. 404.1560(c) and 404.1566).

11. Plaintiff has not been under a disability, as defined by the Social Security Act, from February 24, 2005, through the date of this decision (20 C.F.R. 404.1520(g)).

(Tr. 12-19).

## IV. Discussion

To be eligible for disability insurance benefits, a claimant must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382(a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick

v. Secretary of Health and Human Servs., 887 F.2d 864, 868 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, she is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits her ability to do basic work activities. If the claimant's impairment is not severe, she is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, she is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform her past relevant work. If the claimant can, he is not disabled. Fifth, if the claimant cannot perform her past relevant work, the ALJ determines whether she is capable of performing any other work in the national economy. If the claimant is not, she is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

### A.    Standard of Review

The district court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the decision

of the Commissioner.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

### B.    Plaintiff's Allegations of Error

Plaintiff contends that the ALJ (1) improperly evaluated her mental impairments as non-severe in his residual functional capacity (RFC) determination; (2) failed to sufficiently cite medical evidence in support of the RFC determination; and (3) improperly assessed her credibility.

#### 1.    The ALJ's RFC Determination

The ALJ determined that plaintiff has the residual functional capacity to perform the light work at as defined in 20 CFR 404.1567(b) with the following limitations: she can never climb ladders, ropes or scaffolds, can only occasionally climb stairs or ramps, can engage in no repetitive overhead lifting or work involving very fine manipulation, and must avoid concentrated exposure to extremely cold temperatures, vibrations of the body, and working in hazardous situations such as at heights.

The Social Security Administration has stated that "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2.  A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations."  Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration and citations omitted).  "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC."  Id. (citation

omitted).  "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant."  Id.  Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.  Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)).

## Plaintiff's Mental Impairments

The ALJ found in step three of the five-step evaluation process that plaintiff's mental impairments were not severe. He properly applied the special technique for evaluating a claimant's functional limitations due to mental impairments.  20 C.F.R. § 404.1520a.  The regulation sets out four domains of functioning that must be evaluated: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  § 404.1520a(c)(3).  The ALJ made specific findings with respect to all four domains and thus properly applied the regulation. This formed the basis of the ALJ's more rigorous evaluation of plaintiff's mental impairments in the RFC determination.

Step three of the five-step evaluation provides that a claimant is not disabled if his impairments are not "severe," and have lasted or are expected to last for at least 12 months.  20 C.F.R. § 416.920(a)(4)(ii); § 416.909 (duration requirement).  An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities. Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007) (citing Bowen v. Yuckert, 482 U.S. 137, 153 (1987)).  It is the claimant's burden to establish that her impairment or combination of impairments are severe.  Id.  "Severity is not an onerous requirement

for the claimant to meet, but it is also not a toothless standard. Id. at 708 (citations omitted).

Plaintiff contends that the ALJ erroneously concluded that her mental impairments were non-severe and thus did not assign any mental limitations in the RFC determination. Plaintiff cites to the ALJ's statement that "there is no evidence that she has ever undergone a mental status evaluation and actually found to have signs or symptoms of mental illness" as not supported by medical evidence, namely the records of Dr. Noguera. (Tr. 17). When the statement is read in the context of the record, the reasonable interpretation is that the ALJ was referring to the fact that plaintiff had never been referred to a mental health professional nor sought one out on her own. Thus, there was no diagnosis of a mental illness made by a psychologist, psychiatrist or other mental health specialist. The ALJ noted that plaintiff had received medication for symptoms of mild mental impairments from her treating physicians, including Dr. Noguera. Dr. Noguera reported that plaintiff suffered from complaints of stress and depression, and described her as anxious, depressed, sad, tearful, and agitated. However, Dr. Noguera also noted that plaintiff was able to make sensible decisions, was appropriate in social situations, and had appropriate thought processes, with exercise and stress reduction providing some alleviation. Dr. Noguera did not perform any mental status examinations nor did he refer plaintiff to a mental health specialist. Instead, he prescribed Prozac, refilled plaintiff's other medications, and a referred her to a pain management physician.

Plaintiff contends that there is additional evidence of her mental impairments which the ALJ did not properly analyze. Plaintiff specifically points to her history of prescriptions for Paxil and Wellbutrin. Plaintiff began taking Paxil in 2004 (prior to her

application for disability benefits) for dysthymia and stress related to her mother's illness. While taking Paxil, plaintiff reported on numerous occasions that she was doing well. As the ALJ noted, plaintiff's disability application does not cite any mental impairment as the reason for plaintiff's inability to work. In fact, plaintiff did not complain of mental impairments again until the fall of 2007, and there is no evidence that she ever claimed that these impairments affected her ability to work. The fact that plaintiff was prescribed Wellbutrin does not support a claim of a disabling mental health impairment, as this drug was prescribed for smoking cessation.

Further, the ALJ's determination that plaintiff's mental impairments are non-severe is supported by the Psychiatric Review Technique performed by consultant H. Weems in November 2006. Weems noted that plaintiff was diagnosed with dysthymia but opined that the disorder was not severe, and that plaintiff had only a mild limitation due to difficulty maintaining concentration, persistence, or pace. Plaintiff reported the ability to engage in household chores and personal self care. Plaintiff also denied any problems in her ability to get along with others, follow directions, or pay attention. Weems opined that the evidence failed to support the existence of a severe mental impairment.

The ALJ's determination of plaintiff's mental impairments as non-severe is supported by substantial evidence in the record.

## Use of Medical Evidence in RFC Determination

Plaintiff next argues that the ALJ did not cite sufficient medical evidence in support of the RFC determination.

An ALJ may rely upon the opinion of a nontreating or consultative "medical source," but he may not give the same weight to the opinion of a nonmedical, or lay,

state agency evaluator. <u>Williams v. Astrue</u>, 4:11CV00057 AGF, 2012 WL 946806, at *9 (E.D. Mo. Mar. 20, 2012). Reliance on the opinion of nonmedical state evaluator will not, without more, provide substantial evidence in support of an RFC. <u>See, e.g.</u>, <u>Dewey v. Astrue</u>, 509 F.3d 447, 449–50 (8th Cir. 2007).

The RFC determination must be supported by "some" medical evidence that addresses claimant's ability to function in the workplace. <u>Baldwin v. Barnhart</u>, 349 F.3d 549, 556 (8th Cir.2003) (<u>citing</u> <u>Nevland v. Apfel</u>, 223 F.3d 853, 858 (8th Cir. 2000)). The ALJ makes an exhaustive list of plaintiff's medical history with physicians' notes during step three of the evaluation process. However, he only cites specific ailments the plaintiff alleged and does not refer to specific doctor's opinions, physical therapist's opinions, or even the RFC. Because the ALJ came to the same conclusions as the state counselor in the RFC without citations to claimant's treating or consulting physicians, it can be inferred that he gave great weight to the RFC report prepared by Melissa Guilliams, who is not a doctor. Thus, it appears that the ALJ weighed the opinion of a layperson under the rules appropriate for weighing a medical opinion, which constitutes legal error. <u>Dewey</u>, 509 F.3d at 449.

In reaching his RFC determination, the ALJ gave improper weight to the opinion of a non-medical source. The Court cannot assess the amount of weight the ALJ gave to treating physicians, non-treating consultants, and non-medical sources without more, and thus the matter must be remanded for further assessment of plaintiff's RFC.

## 2.    The ALJ's Credibility Determination

In reaching his RFC determination, the ALJ stated that plaintiff's allegations regarding the intensity, persistence, and degree of limitation caused by her impairments were not entirely credible.

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001). "In order to assess a claimant's subjective complaints, the ALJ must make a credibility determination by considering the claimant's daily activities; duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medication; and functional restrictions." Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  The ALJ is not required to discuss each Polaski factor, so long as the factors were acknowledged and examined prior to discounting the claimant's subjective complaints.  See Lowe v.Apfel, 226 F.3d 969, 972 (8th Cir. 2000).

The claimant's work history and the absence of objective medical evidence to support the claimant's complaints are also relevant.  Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 2000). A disability claimant's subjective complaints of pain may be discounted if inconsistencies in the record as a whole bring those complaints into question.  Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006).  Although an ALJ may not disregard subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary.  Id. (quoting Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002)). The courts will defer to an ALJ's credibility finding if the ALJ

"explicitly discredits a claimant's testimony and gives a good reason for doing so." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (citation omitted).

In reaching his credibility determination, the ALJ considered plaintiff's reports to her treatment providers that her pain had lessened and that she was doing well following her neck surgery, the carpal tunnel release, pain management, and physical therapy. The ALJ also found plaintiff's claims of disabling depression and anxiety were not supported by any mental status evaluation and were inconsistent with plaintiff's testimony about her daily activities. See Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000) (absence of evidence of ongoing counseling or psychiatric treatment or of deterioration or change in claimant's mental capabilities disfavors finding of disability); Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010) (quoting Heino v. Astrue, 578 F.3d 873, 881 (8th Cir. 2009)). The Court finds that the ALJ's credibility determination was adequately supported by citations to evidence in the record. See Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006) (finding no error in ALJ's credibility determination where ALJ noted ability to perform household chores and engage in recreation).

## V. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is not supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate judgment in accordance with this order will be entered this same date.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 10th day of September, 2012.